UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES MOLPUS,

        Plaintiff                         Civil Action No. 05-73091

v.                                  HON.  VICTORIA A. ROBERTS
                                     U.S. District Judge
                                     HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

        Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff James Molpus brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying his application for Disability Insurance Benefits (DIB)under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).   I recommend that Defendant's Motion for Summary Judgment be denied, and Plaintiff's Motion for Summary Judgment be granted, remanding this case for further hearings.

## PROCEDURAL HISTORY

On December 17, 2001, Plaintiff filed an application for benefits, alleging an onset of disability date of July 1, 2001 (Tr. 51-53).   After the denial of his claim, Plaintiff filed a

request for an administrative hearing, held on July 16, 2004 in Flint, Michigan before Administrative Law Judge (ALJ) Regina Sobrino (Tr. 305). Plaintiff, represented by attorney David I. Megdell, testified (Tr. 306-322, 334-335), as did Robert Fritzen, Ph.D, a psychologist, and Timothy Shaner, acting as Vocational Expert (VE)  (Tr. 322-328, 328-337).          In a decision issued November 23, 2004, ALJ Sobrino found that although Plaintiff had no past relevant work,  he retained the residual functional capacity to perform a limited range of light work found in significant numbers in the national economy (Tr. 23). On June 29, 2005, the Appeals Council denied review (Tr. 5-7).  Plaintiff filed for judicial review of the final decision on August 10, 2005.

## BACKGROUND FACTS

Plaintiff, born October 22, 1957, was 47 when the ALJ issued her decision (Tr. 24). He received a high school diploma and worked as a cement worker, truck driver, dock worker, production worker, and automotive detailer (Tr. 76).  Plaintiff alleges disability to due to back and shoulder problems, depression, and chronic obstructive pulmonary disease (Tr. 23, 67).

### A.      Plaintiff's Testimony

Plaintiff testified that he lived with his sister and her family in Burton, Michigan (Tr. 306-307).  He reported that arm numbness, which prevented him from lifting equipment, obliged him to leave his job as a cement worker (Tr. 308).  He stated that he also experienced difficulty standing and walking since breaking his left leg in 2002 (Tr. 308).  He estimated that with the help of a cane, he could walk up to a mile and that he could lift up to 50 pounds

-2-

(Tr. 309).  He stated that he experienced balance problems, difficulty manipulating small objects, and trouble  reaching forward (Tr. 310).  He denied problems reaching overhead or bending, but testified that he experienced difficulty climbing and descending stairs (Tr. 312).

Plaintiff testified that he cared for a pet fish and continued to dress and groom himself (Tr. 313-314). He reported that he mowed the lawn with a riding mower and watered the garden on an occasional basis, but relied on his sister to perform most of the household's chores, adding that he helped her grocery shop (Tr. 312).  He stated that he no longer engaged in hobbies and generally limited his social contacts to relatives who came to visit (Tr. 313).  He testified that he drove only occasionally, indicating that hand numbness made steering difficult (Tr. 314).  He stated that since he stopped working  he had traveled to Mississippi for two family members' funerals (Tr. 315).

Plaintiff reported that he currently took Paxil, Topomax, Zestril, Klonopin, Vicodin, Advair, Lomotil, Albuterol, and a rescue inhaler (Tr. 317).  He testified that side effects from his medications caused diarrhea (Tr. 317).  He indicated that since doubling his dosage of Topomax he experienced decreased hand numbness and stuttering, but the increased dosage obliged him to nap twice a day (Tr. 318).

Plaintiff indicated that he had worked previously as an auto detailer, truck driver, warehouse worker, and cement worker (Tr. 320-321).  He opined that he could no longer work as a cement worker due to his current inability to hold a shovel or climb ladders (Tr. 321).  Plaintiff testified that his treating medical physician had not referred him to mental health care providers (Tr. 324).

-3-

**B.      Psychologist's Testimony**

Dr. Fritzen testified that he evaluated Plaintiff's medical records in relation to Section 12.04 (adjustment disorder with depressed mood) and 12.07 (conversion reaction) (Tr. 325). He opined that Plaintiff's medical impairments, either individually or in combination, did not meet or equal any of the listed impairments found in Appendix 1, Subpart P, Regulation No. 4. He found that Plaintiff experienced moderate restrictions of activities of daily living; mild difficulty in maintaining social functioning; and moderate difficulties maintaining concentration, persistence or pace (Tr. 325). He stated further that Plaintiff's work activities would be limited by "some" difficulty in socializing with the general public, advising that Plaintiff's work environment "would need to be rather low keyed, repetitious, without a great deal of significant, or extensive supervision, and not within the position of being in contact on a consistent basis with the public" (Tr. 326). He characterized somataform conversion reaction as the "inability to adequately deal with psychological stressors which unconsciously are then brought into play through physical reactions." (Tr. 326).

**C.   Medical Evidence**

**1. Treating Sources**

In August, 2001, Plaintiff reported right shoulder pain (Tr. 261). Maria Golega, M.D., prescribed Vicodin and Naprosyn, noting that Plaintiff's blood pressure was slightly elevated (Tr. 261). Notes from an August, 2001 exam conducted through McLaren Medical Center also indicate that Plaintiff experienced hypertension and chest pressure (Tr. 118). Plaintiff, reporting relief from antacids and nitroglycerin, was advised to quit smoking (Tr. 118-119).

-4-

An October, 2001 neurologist's report indicates that Plaintiff, a former crack cocaine user, complained of headaches, dizziness, and lack of coordination (Tr. 206). A November, 2001 report indicated that Plaintiff, who was diagnosed with cervical disk herniation, complained of numbness, tingling, weakness and pain, with muscle spasms in the upper and lower extremities (Tr. 255). The same report stated that Plaintiff exhibited symptoms of depression (Tr. 255).

January, 2002 cardiology results showed mild left ventricular hypertrophy, but were otherwise normal (Tr. 136). Anthony C. DeFranco, M.D., advised Plaintiff that he would experience lowered cholesterol if he stopped smoking and lost weight (Tr. 136). A CT scan of his lungs performed in the same month showed a 7 mm pulmonary nodule (Tr. 251). Pulmonary specialist Joseph K. Varghese also examined Plaintiff, who complained of chest tightness and wheezing (Tr. 189). Polysomnogram reports generated in the same period showed that Plaintiff experienced sleep apnea and was advised to undergo home nasal CPAP therapy and the use of a heated humidifier while sleeping (Tr. 137, 144). A followup examination revealed that Plaintiff's symptoms were "well controlled with CPAP therapy (Tr. 137; *see also* Tr. 188). In February, 2002, John C. Kohn, D.O., noted that Plaintiff suffered from cervicalgia and cervical radiculitis secondary to cervical disc herniations and cervical degenerative changes (Tr 150). He reported that Plaintiff currently took Skelaxin and up to 9 to 12 Vicodin each day for pain management (Tr. 150). The same month, Dr. Kohn administered cervical epidural steroid injections with apparently good results (Tr. 153).

In March, 2002, followup notes indicate that Plaintiff was not deemed a good

-5-

candidate for back surgery (Tr. 248). Dr. Goleba referred Plaintiff for a neurological examination which showed inconclusive results[1] (Tr. 244, 248). The next month, exam notes indicated that a pulmonary function test showed moderate obstruction (Tr. 246). A cardiopulmonary stress test performed the same month showed normal results (Tr. 168). Also in April, 2002, neurologist Naganand Sripathy, M.D., noted that Plaintiff continued to complain of shoulder and neck pain, along with intermittent tingling in his arms and legs (Tr. 177). Dr. Sripathy observed that Plaintiff made continuous short jerking movements (Tr. 178). He also noted a strong family history of bipolar disorder (Tr. 179).

In May, 2002, Dr. Goleba noted that Plaintiff had been assessed with choreoathetosis, Parkinson's disease, hypertension, and chronic pain, commenting in the same month that Plaintiff was unable to function without Klonopin and Vicodin, as well as Procardia and Micardis which he took to control his blood pressure (Tr. 240-241). In July, 2002, Plaintiff exhibited severe upper extremity tremors (Tr. 238). Notes from a May, 2003 checkup indicate that Plaintiff continued to experience weakness, numbness, gait problems, joint pain, and myalgia (Tr. 224). However, he reported to Dr. Varghese the same month that Klonopin had limited his myoclonic jerks and stiffness to an occasional basis (Tr. 180). Plaintiff acknowledged that he had abused methamphetamine in the past (Tr. 180). Dr. Varghese commented that Plaintiff's movement disorder could be attributable to his former use of street drugs (Tr. 180). Nerve conduction studies performed in June, 2002 showed normal

---

[1] Neurologist Hugo M. Lopez Negrete, M.D., concluded that Plaintiff did not require surgical treatment or a limitation on his activities (Tr. 200).

results (Tr. 195).   A Respiratory Questionnaire, completed by Plaintiff in April, 2003 indicates that he had quit smoking one month earlier, but still experienced chest tightness and shortness of breath  (Tr. 223).

Notes from a  December, 2002 examination at the University of Michigan Medical Center show that Plaintiff's involuntary movements became less prominent after his Klonopin dosage was increased (Tr. 277).   In August 2003 , Kristen L. Gruis, M.D., examined Plaintiff, who reported that former problems with foot and shin numbness had been resolved, but noted that he continued to demonstrate "some abnormal involuntary movements of his extremities and head, as well as slurred and stuttering speech" (Tr. 274).  Plaintiff also told Dr. Gruis that he had gait problems which obliged him to use a cane (Tr. 274).  Dr. Gruis stated that tests for Huntington's disease had been negative, noting that his MRI's contained "no evidence of pathology explaining his symptomatology" (Tr. 275).  She opined that Plaintiff was "somewhat predisposed to a conversion disorder given his family history of bipolar disorder," recommending that he seek mental health counseling for his "conversion disorder and possible depression," along with physical therapy for gait retraining (Tr. 275-276).    A March, 2004 MRI showed results possibly consistent with "mild intracranial demyelinating disease/MS" (Tr. 285).  The same month, Dr. Goleba composed an opinion letter on behalf of Plaintiff, stating that he suffered from severe depression and conversion reaction, and that although his current medications had stabilized his condition, he required both psychotherapy and group therapy (Tr. 283).  She indicated that Plaintiff's financial situation prevented him from pursuing appropriate mental health treatment (Tr. 283).

## 2. Consulting Sources

In March, 2003 a Residual Functional Capacity Assessment of Plaintiff's medical files found that he retained the ability to lift 20 pounds occasionally and 10 pounds frequently, with an unlimited ability to push and pull in the lower extremities (Tr. 214).  The report found further that Plaintiff retained the ability to balance, stoop, kneel, crouch, and crawl only occasionally, with a complete prohibition on climbing (Tr. 215).  Plaintiff was deemed able to reach and feel, but was limited to only frequent handling and fingering (Tr. 216).  The report noted no communicative or environmental limitations beyond a prohibition on moderate exposure to fumes, odors, dust, and gases; concentrated exposure to humidity; and avoidance of all hazards[2] (Tr. 217).  An accompanying form stated that Plaintiff "does not allege mental problems," and "has not been treated for mental problems" (Tr. 222).

In April, 2004, Psychologist Matthew P. Dickson, Ph.D., performed a consultive examination of Plaintiff, noting that he exhibited a stutter and involuntary movements (Tr. 288).  Plaintiff reported depression stemming from his inability to work, but indicated that he enjoyed generally good relationships, adding that his shaking made him self-conscious (Tr. 288).  He appeared well-groomed and reported that he continued to take care of his personal needs but could perform household chores for only short periods due to fatigue (Tr. 289).  He stated that he still held a valid driver's license, but did not like to drive (Tr. 289).

---

[2]The assessment, performed by Rosamma Nidhiry, M.D., appears to contain an inconsistency.  She notes that Plaintiff's treating sources deem his speech unusually slow, but then concludes elsewhere that he does not possess any communicative (speaking) limitations (Tr. 215, 217).

-8-

Dr. Dickson noted that "[b]oth conversion disorder and his dependent tendencies were evidenced during the exam today" (Tr. 291). He gave Plaintiff a "guarded" diagnosis, assigning him a GAF of 55[3] (Tr. 291). An attached report states that Plaintiff was "mentally capable" (Tr. 294).

### 3.   Material Submitted Subsequent to the Administrative Decision[4]

In March, 2005 Steven Frank, Ph.D, performed a consultive examination of Plaintiff, opining that he was disabled from all work as a result of a conversion disorder (Tr. 298). He found that after suffering from Bell's Palsy four years before, he developed "pseudoseizures, involuntary movements . . .and other symptoms of a conversion disorder" (Tr. 298).

### D.   Vocational Expert Testimony

The VE's vocational analysis found that all of Plaintiff's past relevant work was unskilled, classifying his work as an auto detailer and truck driver at the light level of exertion and his work as a warehouse worker at the heavy exertional level (Tr. 113). The VE added that based on Plaintiff's testimony, he also performed unskilled work as a construction

---

[3]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 34 (*DSM-IV-TR* ), 30 (4th ed.2000).

[4]Pursuant to  *Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir. 1993), Dr. Frank's assessment, submitted to the Appeals Council subsequent to the administrative decision, cannot be considered by the Court. In *Cotton*, the court held that where the Appeals Council denies a claimant's a request for a review of his application based on new material, the district court cannot consider that new evidence in deciding whether to "uphold, modify, or reverse the ALJ's decision." *Id.,* 2 F.3d at 695-96.

laborer at the medium level of exertion (Tr. 329).   ALJ Sobrino then posed the following

question to the VE:

> "I'd like you to assume a person who has that work background, and I'd like
> you to assume that this hypothetical person was born in 1957, the individual has
> a twelfth grade education.  Assume that the individual is limited to lifting,
> carrying, pushing, or pulling no more than 10 pounds frequently, or 20 pounds
> occasionally.  Assume that the individual is able to stand and walk as many as
> eight hours in an eight-hour work day, and sit up to eight hours in an eight hour
> work day.  The individual cannot climb ladders, ropes, or scaffolds, cannot
> crawl, can occasionally climb stairs with handrails, can occasionally balance,
> stoop, kneel, and crouch.  The individual can frequently handle and finger,
> should not perform overhead reaching with the right arm . . . [-] the dominant
> arm.  This individual should not be exposed to hazards, should have a clean air
> environment, should not be exposed to extremes of temperature or humidity.
> The individual should not drive as a work duty.  Assume that this individual is
> limited to simple, repetitive, routine work.  The individual can tolerate
> superficial contact with coworkers and supervisors, but should not perform
> work that involves dealing with the general public.  The individual is limited
> to performing work that is low stress.  Can you tell us what low stress work
> involves in the work setting?"

(Tr. 329-330).

The VE testified that "[l]ow stress would be work which would have limited

independent judgment or reasoning, limited responsibility, no production line requirements,

limited public contact, and limited complexity" (Tr. 330).  He found that based on the

parameters of the hypothetical question, Plaintiff could perform his past relevant work as an

automotive detailer (Tr. 330).  He found that given the above limitations, Plaintiff could also

perform a range of light and sedentary unskilled work, including work as a surveillance

system monitor (14,000 jobs in the regional economy) or sorter (2400 jobs) at the light level

of exertion, as well as the jobs of inspector (1,800 jobs) and assembler (13,000 jobs) at the

-10-

sedentary level of exertion (Tr. 331). He reported that if Plaintiff were obliged to use a cane, the jobs of kitchen worker and sorter would be "difficult, if not impossible" to perform, finding further that given that additional limitation, he could still perform the jobs of inspector and assembler (Tr. 331).

The VE indicated further, in response to counsel's questioning, that if Plaintiff's testimony that he needed to sleep for two hours each workday were credited he would be unable to perform any of the above-cited jobs (Tr. 333). He stated that the jobs cited above were consistent with the information provided in Dictionary of Occupation Titles (DOT) and represented incidental figures for the lower peninsula of Michigan (Tr. 332).

E.      The ALJ's Decision

ALJ Sobrino determined that Plaintiff had the severe impairments of degenerative disc disease of the cervical spine, degenerative joint disease of the right shoulder, intracranial white matter disease (mild), an adjustment disorder with depressed mood, a conversion disorder, chronic obstructive pulmonary disease, and substance abuse (in remission), finding however, that Plaintiff's impairments did not meet or medically equal one of the listed impairments found in Appendix 1 of the Social Security Regulations (Tr. 23).

The ALJ found that Plaintiff retained the residual functional (RFC) capacity to

"lift, carry, push and pull 10 pounds frequently and 20 pounds occasionally (sic). He can stand/walk 8 hours per 8-hour day, and sit up to 8 hours in an 8-hour work day. He cannot climb ladders, ramps, or scaffolds, or crawl. He can occasionally stoop, balance, kneel, crouch, and climb stairs (with hand rails). He should avoid overhead reaching with the right (dominant) arm, exposure to hazards, exposure to extremes of humidity or temperature, and driving as a work duty. He should have a clean air environment. He can

-11-

> frequently (but not constantly) handle and finger.  He should avoid work activity that involves speaking more than a few sentences at any one time.  The claimant is limited to performing low stress work that is of a simple, routine nature, and that does not require more than superficial contact with co-workers and supervisors.  He should not be required to deal with the general public"

(Tr. 23).  Based on Plaintiff's RFC, she found that although Plaintiff's non-exertional limitations prevented him from performing the full range of light work, he could perform the jobs of a kitchen worker, sorter, inspector, and assembler (Tr.23-24).

The ALJ supported her non-disability determination by stating that she found Plaintiff's "allegations of disabling symptoms . . . not fully substantiated by the objective medical or other evidence," citing Plaintiff's ability to walk extensively, maintain social contact, and perform yard work  (Tr. 21, 23).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into

account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

**A.    Treating Physician**

-13-

Plaintiff argues that the ALJ erred by discounting Dr. Golega's's opinion that he was precluded from full time employment, contending that administrative decision erroneously found that his treating physician's findings were not supported by objective medical tests. *Plaintiff's Brief* at 2; Tr. 21. He maintains that Dr. Golega's conclusion that he was disabled as the result of a conversion disorder is supported, rather than contradicted, by the findings of Drs. Gruis, Dickson, and Fritzen. *Id.*

In *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 (footnote 7) (6th Cir. 1991), the court stated that "it is well-settled in this circuit that treating physicians' opinions, based on objective evidence, should be accorded significant weight. If uncontradicted, the physicians' opinions are entitled to complete deference." In *Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544 (6th Cir. 2004) the court held:

> "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion."

Further, the "ALJ must 'give good reasons' for not giving weight to a treating physician in the context of a disability determination." *Id.*; 20 C.F.R. §404.1527(d)(2).

The ALJ found first that Dr. Goeba's's disability opinion should not be accorded controlling weight because she failed to provide "objective medical test results or other clinical evidence in support of a finding of disability" (Tr. 21). However, Plaintiff's medical records, which indicate that Dr. Goeba treated Plaintiff on a regular basis for approximately

-14-

four years, also show that Dr. Goeba referred Plaintiff to numerous specialists in an effort to better treat his medical and emotional problems, including a cardiologist (Tr. 134) in August, 2001; a neurologist (Tr. 205) in October, 2001; a pulmonary specialist (Tr. 189); and a sleep study specialist (Tr. 144) in January, 2002. From December 2002 through August, 2003, Plaintiff underwent neurological evaluations by University of Michigan Hospital staff (Tr. 174-177).   Most significantly, after several months of evaluation, U-M Department of Neurology physician, Dr. Gruis, in a letter addressed to Dr. Goleba, made the following finding after examining Plantiff and viewing his medical records:

> "It is likely that he is somewhat predisposed to a conversion disorder given his family history of bipolar disorder and perhaps bipolar disorder in himself, as he certainly is describing some symptoms that are consistent with depression. He would benefit from consultation with a psychologist and/or psychiatrist in conjunction with physical therapy for gait retraining for his conversion disorder and possible depression"

(Tr. 275-276).  Dr. Goleba's March, 2004 opinion stating that  Plaintiff was unable to work due to a conversion reaction is obviously drawn on the University of Michigan findings:

> "[Plaintiff] is suffering from severe depression and conversion reaction.  He was evaluated in multiple specialty centers including University of Michigan Neuologic Clinic and local neurology offices.  His diagnosis was proved to be just conversion reaction, but this patient is totally disabled to perform any job. . . . [Plaintiff]is currently on antidepressants, sleeping aids and psychotic medications.   He is unable[,] due to lack of insurance to have any psychotherapy.  He does need group therapy and individual therapy, which as we know is the best treatment for conversion reaction."

(Tr. 283).

Moreover, although the ALJ states that "Dr. Goleba's opinion is inconsistent with the objective findings, examinations and observations of Dr. Albin, Dr. Dickson, Dr. Gruis, Dr.

-15-

Negrete and Dr. Wadenstorer," none of those physicians contradicted Dr. Goleba's finding that Plaintiff experienced conversion disorder [5] (Tr. 21). To the contrary, as noted above, Dr. Gruis' opinion that Plaintiff experienced conversion disorder formed the basis of Dr. Goleba's disability finding. Further, although ALJ also draws on the findings of Dr. Albin, Dr. Negrete, and Dr. Wadenstorer to support her conclusion, in fact, all three physicians limited their appraisals of Plaintiff's condition to his *physical* ailments, omitting any discussion of a psychological basis for his symptoms. *See Easter v. Bowen,* 867 F.2d 1128, 1131 (8th Cir. 1989) ("While some of the evidence about [the claimant's] physical problems conflicts, there is no dispute concerning his somatoform disorder . . ."). Admittedly, Dr. Goleba's opinion does not state explicitly that Plaintiff's conversion disorder meets the requirements of a Step Three disability finding.[6] However, this does not mean that Plaintiff

---

[5]Dr. Dickson's cursory finding that Plaintiff did not experience any work-related mental limitations (Tr. 294) stands at odds with Dr. Fritzen's hearing testimony that Plaintiff possessed restrictions in daily living and social functioning, along with pacing and concentrational problems (Tr. 326). Further, although Drs. Dickson and Fritzen made non-disability conclusions, both acknowledged the treating physician's finding that Plaintiff suffered from conversion disorder.

[6]20 C.F.R. 404, Subpt. P, App.1, § 12.07, which addresses conversion disorder (somatoform disorder), states in pertinent part:
 Somatoform Disorders: Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms. (cont.)
The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
A. Medically documented by evidence of one of the following:
1. A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or
2. Persistent nonorganic disturbance of one of the following:

-16-

could not have received a disability finding at Step Five if the ALJ had performed a proper

analysis.   The ALJ's  analysis, which mis-cites the above medical sources to discount Dr.

Goleba's opinion, constitutes grounds for remand by failing to abide by the *Wilson, supra*

requirement that she give "good reasons" for rejecting the treating physician's opinion.[7]

### B.  Hypothetical Question

_____

a. Vision; or
b. Speech; or
c. Hearing; or
d. Use of a limb; or
e. Movement and its control (e.g., coordination disturbance, psychogenic seizures,
akinesia, dyskinesia; or
f. Sensation (e.g., diminished or heightened).
3. Unrealistic interpretation of physical signs or sensations associated with the
preoccupation or belief that one has a serious disease or injury; AND
B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration

[7]The ALJ also cites Plaintiff's testimony that he maintained social contacts and performed yard work in support of her non-disability finding (Tr. 21).  However, Plaintiff, living in the basement of his sister's house, actually stated that he maintained his social contacts only to extent that relatives visited his sister's house (Tr. 313). Further, Plaintiff stated that he "tried to mow the lawn on [his sister's] riding mower.  Sometimes I can do it and sometimes I can't" (Tr. 312).   Plaintiff's yard work, performed intermittently at best, cannot be used, in and of itself, to establish nondisability. *See Walston v. Gardner,* 381 F.2d 580, 586 (6th Cir.1967); *See also Carradine v. Barnhart*, 360 F.3d 751, 755-56 (7th Cir. 2004).  Moreover, pursuant to SSR 96-7p,  Plaintiff's failure to seek regular mental health services cannot be used to discount allegations of limitations without first considering alternative reasons for refraining from treatment. *Id*. at 7-8.   Notably, Plaintiff's treating physician stated in March, 2004 that his financial limitations prevented him from receiving counseling (Tr. 283).

Plaintiff, citing *Felisky v. Bowen*, 35 F.3d. 1027, 1036 (6th Cir.1994), argues that the hypothetical question composed by the ALJ fails to account for a number of his limitations, including his need to sleep during the day and frequent bathroom trips. *Plaintiff's Brief* at 12. He maintains that a hypothetical question including all of his relevant limitations would result in a disability finding. *Id.*

Plaintiff correctly states that an improper hypothetical question cannot serve as substantial evidence under § 405(g), and can result in a remand or reversal. *Whitmore v. Bowen,* 785 F.2d 262, 263-64 (8th Cir. 1986). ( "Unless the hypothetical question posed to the vocational expert by the ALJ can be said to incorporate reasonably all disabilities of the claimant recognized by the ALJ . . . a determination of non-disability based on such a defective question cannot stand."); *See also Bowling v. Shalala,* 36 F.3d 431, 436 (5th Cir. 1994). Sixth Circuit case law also supports Plaintiff's argument that a hypothetical question must reflect an individual's actual limitations. *Webb v. Commissioner of Social Sec.* 368 F.3d 629 (6th Cir. 2004).

However, although a plaintiff's relevant limitations must be acknowledged in the hypothetical question, the ALJ is not required to compose a formulaic hypothetical that lists the impairments. The court in *Smith v. Halter,* 307 F.3d 377, 379 (6th Cir. 2001), rejecting the notion that a hypothetical question must contain talismanic language, found that a question was sufficient provided that it encompassed the plaintiff's relevant limitations: "The ALJ went beyond [a] simple frequency assessment to develop a complete and accurate assessment of Smith's mental impairment."

-18-

In the present case, the ALJ drew from the record in rejecting a portion of Plaintiff's claims of physical limitations. "[T]he ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of Health and Human Services,* 39 F.3d 115,118-119 (6th Cir.1994), *quoting Hardaway v. Secretary of Health & Human Servs.,* 823 F.2d 922, 927-28 (6th Cir.1987). Although as discussed in section **A.**, the ALJ performed a deficient treating physician analysis, her hypothetical question was permissibly confined to the limitations she found supported by relevant evidence. *See Stanley, supra.* Although Plaintiff alleged that he experienced diarrhea between two and five times a day (presumably in a 24-hour period), at worst, his symptoms would be expected to interrupt his work one or two times in an eight-hour shift for no more than a few minutes (Tr. 335). Likewise, the fact that his doubled dose of Topomax obliged him to nap for two hours between the time he arose and retired does not imply that he was unable to stay awake for the his workday's eight-hour duration (Tr. 317-318).

Moreover, I note that the ALJ accounted fully for Plaintiff's depression and deficiencies in concentration, persistence, and pace by precluding production line requirements, and further limiting him to "simple, repetitive, routine work" with only "superficial contact with coworkers and supervisors" and "low stress" (Tr. 329-330). *See Chafin v. Commissioner of Social Sec.,* 2005 WL 994577, 2, 4 (E.D. Mich.2005) (ALJ's hypothetical question addressed Plaintiff's mental deficiencies sufficiently by limiting him to "simple, unskilled work." Further, although the plaintiff had "moderate" deficiencies of concentration, persistence, or pace he could nonetheless perform the work of an assembler,

-19-

packager, inspector, and security monitor).  *See also Lyons v. Commissioner of Social Sec.*
351 F.Supp.2d 659, 662 (E.D. Mich.2004) ("ALJ took into account [the][p]laintiff's
depression . . . by including limitations within the hypothetical . . . limiting the possible jobs
to simple, unskilled, and routine work" ).  The ALJ's hypothetical question, supported by
substantial evidence, does not contain grounds for a remand.

However, because the ALJ improperly supported  her rejection of the treating
physician's opinion with an erroneous reading of the record, a remand is necessary. The final
question is whether to remand for further administrative proceedings and findings or to
remand for an award of benefits using Plaintiff's disability onset date for calculating past due
benefits.  In *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171, 176 (6th Cir.
1994), and *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994), the courts held that it is
appropriate to remand for an award of benefits when "all essential factual issues have been
resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Id.*  This
entitlement is established if  "the decision is clearly erroneous, proof of disability is
overwhelming, or proof of disability is strong and evidence to the contrary is lacking."
*Faucher,* 17 F.3d at 176 (citing *Mowery v. Heckler*, 771 F.2d rectification, 973 (6th Cir.
1985)).  The errors in the administrative decision, while critical, do not suggest that Plaintiff
is automatically entitled to benefits.   Thus,  I find that pursuant to *Faucher,* this case should
be remanded for further proceedings consistent with this Report and Recommendation.

## CONCLUSION

For the reasons stated above, I recommend that Plaintiff's Motion for Summary

Judgment be GRANTED, that Defendant's Motion for Summary Judgment be DENIED, remanding this case for further proceedings.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


S/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE


Dated: April 17, 2006

-21-

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on April 17, 2006.


S/G. Wilson
Judicial Assistant